FILED
United States Court of Appeals
Tenth Circuit

December 28, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOSE RIOS-MORALES,

      Defendant - Appellant.

No. 16-3233

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:14-CR-20117-JAR-2)**

---

Submitted on the briefs:[*]

Gregory C. Robinson, Lansing, Kansas, for Defendant - Appellant.

Thomas E. Beall, United States Attorney, and Carrie N. Capwell, Assistant United States Attorney, Kansas City, Kansas, for Plaintiff - Appellee.

---

Before **BACHARACH**, **McKAY**, and **MURPHY**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

[*] This case was ordered submitted on the briefs on September 28, 2017.

A jury found Defendant Jose Rios-Morales guilty of possessing with intent to distribute more than fifty grams of methamphetamine and conspiring to do the same. He received a sentence of 292 months' imprisonment, at the bottom of the advisory Guidelines range. On appeal, he challenges the admission of 404(b) evidence and raises claims of prosecutorial misconduct, witness perjury, jury taint, and cumulative error.

**I.**

The drug conspiracy at issue in this case involved Defendant, his brother Omar, and co-defendant Felipe Sifuentes. Mr. Sifuentes, who entered into a plea agreement with the government, was a key witness at Defendant's trial. He testified that he began selling methamphetamine around 2011 or 2012. In 2013 or 2014, Mr. Sifuentes stopped selling methamphetamine for a period of time because he owed his suppliers a large sum of money and they would no longer provide him with inventory on credit. In mid-2014, however, Defendant told Mr. Sifuentes "that he knew someone, his brother, that could send [Mr. Sifuentes] some" (Appellant's App. Vol. I at 1165), and a conspiracy was born. Mr. Sifuentes and Defendant's brother never met in person, but Defendant arranged for them to speak on the telephone. They soon agreed that Omar would send methamphetamine for Mr. Sifuentes to sell in Kansas. Mr. Sifuentes agreed to pay Omar $6,200 per pound, giving Defendant an additional $300 per pound as his cut. For his part, Defendant would send the $6,200 per pound to Omar so that Mr. Sifuentes "wouldn't have any issues with that." (*Id.* at 1169.)

Omar's associates in California sent three shipments of methamphetamine to the address Mr. Sifuentes gave to Omar, which belonged to a friend of Mr. Sifuentes whom he knew as "Chabacano." (*Id.* at 1171.) Mr. Sifuentes paid Chabacano for allowing him to use his address in this way. Mr. Sifuentes instructed Omar to send the fourth shipment to Mr. Sifuentes' own address, which he provided to Omar. This shipment was intercepted by postal inspectors. The postal inspectors questioned Mr. Sifuentes, but he disclaimed any knowledge of the package or its contents, and they did not contact him again. Worried by the experience, he told Defendant "that [this] was the last time, that we couldn't work that way, you know, sending it through the mail." (*Id.* at 1178.) For three or four months, Mr. Sifuentes did not engage in any drug trafficking.

Omar came up with a new plan, however, and contacted Mr. Sifuentes to tell him that he had "found another way to send [him] the drugs." (*Id.* at 1179.) His plan was to load the methamphetamine onto a car in California, then pay for the car to be transported on a commercial car hauler to its destination in Kansas. Mr. Sifuentes discussed this idea with Defendant, who "asked if [they] could do this for the last time and, you know, he wants to go on vacation to Mexico and he doesn't have any money." (*Id.* at 1181.) They agreed to go ahead with the plan.

While the car was in transit in Oklahoma, law enforcement officers noticed something suspicious about the car's appearance and, with the consent of the car hauler's driver, they searched the vehicle and discovered several pounds of methamphetamine inside. The officers followed the car hauler to Kansas, where the driver made a recorded

phone call to the number listed on the bill of lading. This number belonged to Mr. Sifuentes, who answered the phone and spoke with the driver. Omar had arranged for Defendant's address to be listed as the delivery address on the bill of lading. However, the parking lot of Defendant's apartment complex was too narrow for the car hauler to safely maneuver in, so the driver arranged to meet with Mr. Sifuentes in a nearby commercial parking lot instead.

After paying the car hauler driver and accepting receipt of the car, Mr. Sifuentes removed the California license plate from the vehicle and replaced it with a Kansas plate. He then drove the vehicle to Defendant's apartment. After parking in Defendant's parking lot, Mr. Sifuentes got out of the car and looked inside of the trunk. He was promptly arrested. He agreed to cooperate and told the officers that the methamphetamine in the vehicle was intended for his friend Jose, who lived at the complex. With the officers listening in and recording, Mr. Sifuentes called Defendant to advise him that the car had arrived. He also told Defendant that the car had a flat tire and that he had left the car unlocked, with the keys under the floor mat, for Defendant.

Other officers took up surveillance positions outside of Defendant's workplace. At about 2 p.m., he left work, got into his car, and started driving southbound on the K-7 state highway, followed by several officers in unmarked vehicles. From K-7, Defendant turned into a Wal-Mart parking lot. He did not stop at the store, but continued on to an outer road, then made a few more turns to end up back on southbound K-7 again. The officers believed he was conducting a counter-surveillance heat run, and they used their

-4-

radios and counter-counter-surveillance tactics to ensure that someone had eyes on Defendant at all times while attempting not to alert him to their pursuit. As he drew up to his apartment complex, Defendant again engaged in what the officers took to be a counter-surveillance measure by driving past his complex to a shopping center just east of his apartment, then making his way through the parking lot back to his apartment. After parking, Defendant got out of his vehicle and immediately went into his apartment without stopping to look at the car Mr. Sifuentes had called him about and left unlocked in his parking lot.

Over the next few hours, Mr. Sifuentes made several recorded calls to both Omar and Defendant. Eventually, Mr. Sifuentes told Defendant that he was heading over to Defendant's parking lot and would meet him there. An officer drove Mr. Sifuentes, in Mr. Sifuentes' own car, to the parking lot, and Mr. Sifuentes got out and began walking toward the drug car. At this point, Defendant left his apartment and met Mr. Sifuentes near the car. Mr. Sifuentes opened the driver's side door and showed a sample of the methamphetamine to Defendant. Both men were then arrested.

Other witnesses testified at trial that Defendant's brother Omar was incarcerated throughout the course of the conspiracy, but the facility where he was imprisoned had "a big issue" with contraband, particularly cell phones, finding their way into inmates' hands. (*Id.* at 433.) A correctional officer further testified about finding Omar in possession of a cell phone on one occasion in 2014.

The jury also heard testimony about Defendant's involvement with Mr. Sifuentes in the earlier conspiracy to possess and distribute drugs obtained from Mr. Sifuentes' previous suppliers, with an instruction that this evidence was offered only for the limited purpose of proving Defendant's knowledge, motive, and opportunity in the charged conspiracy. Mr. Sifuentes testified that, as part of the earlier conspiracy, he made three trips to California in 2012 and 2013 to pick up methamphetamine from his suppliers, package it, and mail it back to his house. He testified that he paid Defendant $2,000 to $2,500 per trip for driving to California with him and assisting him in packaging and mailing the drugs. He further testified that Defendant was well aware that the purpose of these trips was to obtain drugs. On the first two trips, Mr. Sifuentes testified, they packaged the drugs at a hotel in Chino and then shipped them from a FedEx across the street from the hotel. On the third trip, they were delayed arriving in California due to car troubles, and, after they had picked up the drugs, Mr. Sifuentes ended up packaging them in the back of the car while Defendant was driving. They stayed overnight with Defendant's cousin in California on that trip.

On their way back to Kansas from their third and final trip to California, they were stopped by law enforcement officers in Oklahoma. Although the drugs had been sent to Kansas via FedEx, their packaging materials were still in the vehicle, and a police canine apparently alerted on the vehicle. Defendant and Mr. Sifuentes waited in the back of the police car while the police searched their vehicle. While they waited, Mr. Sifuentes later testified, they had a conversation about how "this was going to be our last time. If we got

out of this one, we would not go back to California." (*Id.* at 1158.) The police ultimately let them continue on their way.

Mr. Sifuentes and Defendant did not make another drug-buying trip to California, at least in part because Mr. Sifuentes ran into monetary difficulties with his source of supply. Some of the lower-level dealers he had sold drugs to on credit were unable to pay their debts to him, which, in turn, left him in debt to his own suppliers. His involvement in the earlier conspiracy ended because of these unpaid debts. But, as described above, it was then that Defendant initiated the conspiracy at issue in this case by offering to introduce Mr. Sifuentes to a new source of supply, his brother Omar.

On the fifth day of the trial, the court informed the attorneys for both parties that one or more of the jurors had spoken to a court security officer about a concern they had regarding a Hispanic man a juror had seen looking at vehicles in the juror parking lot the previous evening. After hearing from both parties about how they believed this issue should be handled, the court followed defense counsel's suggestion to conduct individual *in camera* interviews with each juror to attempt to determine whether the jurors had been tainted without, hopefully, "rais[ing] the specter that . . . yeah, this must be real thing." (*Id.* at 1302.)

In these interviews, the court learned that a female juror had stopped to use the restroom on her way out of the courthouse and was thus the last juror to leave. As she arrived alone at the juror parking lot, she saw a young man in a red pickup truck. He stood out to her because most people in Kansas City—including all of the jurors—were

wearing blue to support the Kansas City Royals in the World Series playoffs, but he was dressed completely in red. His behavior struck her as suspicious because he slowed down as he drove past her, coming within just a few feet of where she was standing, and stared at her. After getting into her vehicle, she saw another juror who was still in the parking lot and rolled down her window to ask him if he had noticed this man and his suspicious behavior. This juror had been checking emails and had not seen anything. The female juror then flagged down another male juror who was still in the parking lot and asked if he had noticed the young man in the red pickup truck. He said, "No, just take a different route home." (Appellant's App. Vol. II at 188.) She joked that nobody noticed anything and said, "[a]nd we're in the jurors' parking lot which shouldn't necessarily be highlighted or have notification that this is where jurors are." (*Id.*) He suggested again that she just take another route home, and they both left.

As the male juror was leaving, he saw the red pickup truck "driving along very slowly," with the driver apparently looking at the cars in the juror parking lot. (*Id.* at 176.) The truck left the lot, and the juror followed until he was able to take a photo of the truck and record its license plate number. The male juror told the court that "the only thing [he] was concerned about is any type of intimidation or repercussions to members of the jury and/or family or anything like that." (*Id.* at 177–78.) He told the court, "[T]he only reason I followed to get the picture of it was in case something—I would have a record of it if I'm in [the small town where the juror resided] and I see that vehicle and I would know that maybe something is up. But that—that's the only thing I was worried

-8-

about." (*Id.* at 180–81.) He said he was not particularly concerned—he just wanted to have a record of the truck's license plate in case something did happen.

The next morning, the two jurors who had observed the truck told several of the other jurors about it, and the male juror showed them the picture he had taken the previous night. He did not mention his concern about possible juror intimidation or repercussions to any of the other jurors. The other jurors who participated in this conversation all reported that the female juror said she felt uneasy and uncomfortable because of the way the pickup truck driver stared at her and because the situation with him driving slowly in the lot "just didn't seem to fit right." (*Id.* at 182.) Some of the jurors said they had already been concerned about the safety of themselves and/or their vehicles in this neighborhood, and some expressed the opinion that it was "not the wisest thing" to have the jurors park in a marked parking lot (*id.* at 192), but none expressed any concerns about the man in the pickup truck being potentially linked to Defendant or anyone else involved in this case. The only juror who mentioned the man's ethnicity was the female juror who first observed him in the lot, and then only in response to the court's request that she describe him. This juror said that she reported the incident not because she felt threatened, but because she "just felt that moving forward it—that parking lot probably should not have a notification that this is where jurors park." (*Id.* at 190.)

The court agreed with the jurors that it might be best not to have the jurors parking in a marked parking lot and told them that, in the meantime, they would be moved to a secure lot. The court also suggested they walk to their cars as a group, not because there

was any particular threat, but simply to ensure that everyone was safe walking in that area after dark, as other juries had been instructed to do in the past. The court asked a few of the more concerned jurors if these precautionary measures would allay their concerns, and they said yes.

After completing the interviews, the court reported to the attorneys that the jurors had expressed general concerns about the marked parking lot and about crime in the area, but said they had no reason to think the man in the parking lot was related to this case. The court said it believed the jury was not tainted: the jurors did not feel threatened or concerned about service on this particular case, and moving the jurors to a secure lot would resolve any of their remaining concerns. Defense counsel then said that, based on the court's summary of what the jurors said, he had no objection to continuing with the trial with these jurors.

At the conclusion of the trial, the jury found Defendant guilty of both of the charged counts, and he was sentenced to 292 months of imprisonment. Defendant then appealed.

## II.

Defendant argues that there are five reasons why his conviction should be reversed on appeal: (1) the district court should not have allowed the government to elicit testimony from Mr. Sifuentes regarding the prior drug-distribution conspiracy; (2) the government committed several acts of prosecutorial misconduct; (3) Mr. Sifuentes' testimony included intentional misrepresentations and omissions regarding their trips to

California; (4) the district court mishandled the jurors' concerns about the man in the parking lot; and (5) the cumulative effect of all of these errors was prejudicial and mandates reversal. He does not raise any challenges to the district court's sentencing decision. We consider each of Defendant's arguments in turn.

First, we address Defendant's argument that the district court erred in allowing the government to introduce evidence about the prior conspiracy. "Generally, we review a district court's decision to admit evidence for an abuse of discretion, and we reverse a decision only if it is manifestly erroneous." *United States v. Irving*, 665 F.3d 1184, 1210 (10th Cir. 2011) (internal quotation marks omitted). This evidence was admitted under Federal Rule of Evidence 404(b), which provides that evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's propensity to commit a criminal act, but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). "In weighing the admissibility of evidence under this rule, we consider four factors: (1) whether the evidence is offered for a proper purpose, (2) whether the evidence is relevant, (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect, and (4) whether a limiting instruction is given if the defendant so requests." *Irving*, 665 F.3d at 1211 (internal quotation marks omitted).

Defendant argues that the 404(b) evidence in this case fails to satisfy the second and third prongs of this test. Specifically, he contends this evidence was irrelevant because evidence that he went on drug-procurement trips to California does not make it

any more or less probable that he was the money man in a separate drug conspiracy. He further argues that, even if this evidence was relevant, it was unfairly prejudicial because discovery had not been completed in the criminal case involving the earlier conspiracy, and thus there was a hypothetical possibility that exculpatory evidence might have later come to light. We find neither of these arguments to be persuasive.

As the district court thoroughly and persuasively explained in its evidentiary ruling, this evidence was relevant to prove Defendant's motive, knowledge, and intent in this conspiracy. Mr. Sifuentes' testimony that Defendant had knowingly accompanied and assisted him on prior drug-procurement trips to California was relevant to the highly disputed questions of whether Defendant knew that the car his brother and Mr. Sifuentes had arranged to leave at his apartment contained drugs and whether he intended to possess those drugs. Additionally, Mr. Sifuentes' testimony about his inability to continue dealing with his suppliers in the earlier conspiracy—and about the money Defendant made by participating in that conspiracy—was relevant to prove Defendant's motive to initiate this conspiracy with his brother as a new source of supply for Mr. Sifuentes.

As for the question of substantial prejudice, Defendant does not cite to a single case holding that 404(b) evidence may be unfairly prejudicial based on a hypothetical possibility that exculpatory evidence might come to light at a later date.[1] Rather,

---

[1] We note that more than two years have now passed since Defendant first argued that the 404(b) evidence should be excluded based on the possibility that

"[e]vidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. MacKay*, 715 F.3d 807, 840 (10th Cir. 2013) (internal quotation marks omitted). The exclusion of otherwise admissible evidence based on the potential for prejudice "is an extraordinary remedy and should be used sparingly," *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (internal quotation marks omitted), and the district court is granted "considerable discretion" in weighing the potential for unfair prejudice against the probative value of the evidence. *MacKay*, 715 F.3d at 839. We see no abuse of discretion in the court's conclusion that the potential for unfair prejudice did not substantially outweigh the probative value of the 404(b) evidence at issue here.

Next, Defendant raises numerous claims of alleged prosecutorial misconduct. He did not object to any of the alleged instances of misconduct at trial, and he therefore concedes that we review only for plain error. *See United States v. Solon*, 596 F.3d 1206, 1212 (10th Cir. 2012). To demonstrate plain error, Defendant must persuade us that "there is (1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial

---

exculpatory evidence might come to light in discovery in the other drug conspiracy case. He has yet to identify any such actual evidence.

proceedings." *Id.* (internal quotation marks omitted).  None of the alleged instances of prosecutorial misconduct satisfies this demanding standard.

With several of the claimed instances of prosecutorial misconduct, any possible error is certainly not "plain," *i.e.*, "so clear or obvious that it could not be subject to any reasonable dispute."  *United States v. Courtney*, 816 F.3d 681, 684 (10th Cir. 2016).  For instance, Defendant contends that the prosecutor argued facts not in evidence when she said the $300 per pound Defendant would make through this drug conspiracy was a lot of money "to somebody that's paying child support."  (Appellant's App. Vol. I at 1398.) Defendant also contends that there was no evidence to support the assertion that he was paying child support.  However, Government's Exhibit 90, which was admitted at trial by stipulation of the parties, included this information, and thus Defendant has not shown anything improper about the prosecution's reference to this fact.  Similarly, there was nothing improper in the prosecutor's argument that "the only reason that this conspiracy is going on is because of one person.  Jose Rios-Morales."  (*Id.* at 1395.)  Although Defendant points out that the conspiracy involved at least two other persons who were also essential members of the conspiracy, the prosecutor's comment, in context, was clearly referring to the trial testimony that Defendant is the one who initiated this conspiracy by offering to introduce his brother Omar to Mr. Sifuentes as a new supplier of methamphetamine.  If Defendant had not introduced Mr. Sifuentes to Omar, then this particular conspiracy would almost certainly not have occurred, and thus the prosecutor's argument was an accurate summation of the trial evidence.

-14-

We further see no plain error in the prosecutor's statement that Defendant's employment records corroborated Mr. Sifuentes' story about the dates they traveled to California. Defendant argues that this statement, although accurate in itself, constituted a misrepresentation of the evidence because it falsely implied Defendant had denied traveling to California on those dates. However, defense counsel's primary, repeated argument to the jury was that the government's case was based almost entirely on Mr. Sifuentes' uncorroborated and inadequately investigated testimony. Defendant has failed to persuade us that the government committed a plain or obvious error by referring to properly admitted evidence that corroborated Mr. Sifuentes' testimony. Nor is there any merit to Defendant's argument that the reference to his employment records constituted improper bolstering of Mr. Sifuentes' credibility. While a prosecutor may not personally vouch for the credibility of her witnesses, "[a]rgument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990). A simple reference to corroborating trial evidence conveys neither a personal assurance of the witness's veracity nor an implicit indication that there is other evidence, unknown to the jury, that supports the witness's testimony.

Likewise, the prosecutor did not improperly vouch for Mr. Sifuentes' credibility when she argued that the jury could reasonably infer he was telling the truth because,

among other things, Defendant engaged in the types of counter-surveillance measures that the police testified were typical of those involved in the illegal drug trade. Although the prosecutor phrased her argument as a rhetorical question, asking "[h]ow could Felipe Sifuentes have guessed that [Defendant] would engage in not one, but two counter-surveillance drives," (Appellant's App. Vol. I at 1406), it is clear in context that the prosecutor was not asserting that Mr. Sifuentes had correctly guessed or accurately predicted that Defendant would engage in counter-surveillance on his way back to his apartment. Rather, the prosecutor's point was that it was unlikely an innocent stooge who had been wrongfully accused by Mr. Sifuentes would take the indirect route Defendant took, which the police testified was consistent with the types of counter-surveillance measures drug traffickers engage in and which lacked a credible alternative explanation. Any possible error in this argument was certainly not so clear or obvious as to be beyond reasonable dispute.

Defendant further argues that the prosecutor improperly vouched for Mr. Sifuentes' credibility through this statement in her closing argument:

> Now the . . . defense also says, well, you know, [Mr. Sifuentes] just can make stuff up and we can't disprove it. Really? We can't disprove it? Doesn't the average citizen believe that when you're in prison, you can't get a cell phone? **Before I had this job, I certainly did.** Felipe Sifuentes is an average citizen. He doesn't know what you get and don't get in prison. He does now, but he didn't then.
> So ladies and gentlemen, how could he have guessed that this individual in a prison could get ahold of a cell phone? And if he's going to make up some story, boy, that would be a big whopper to make up, wouldn't it? The truth is in the details, ladies and gentlemen, because Omar, he can get cell phones. Sounds like just about anybody that wants to

-16-

in Tallahatchie can.  And, in fact, he got caught with one, and you saw the picture of it.

(Appellant's App. Vol. I at 1409–10 (emphasis added).)  We are not persuaded that the prosecutor's reference to her prior ignorance about the availability of cell phones in prison was so obviously erroneous as to constitute plain error.  While it would certainly have been better for the prosecutor not to discuss her own past assumptions about this particular topic, we cannot say that this error was so clear or obvious as to be beyond reasonable dispute.  The jury heard trial testimony that inmates in Omar's facility had easy access to contraband cell phones and that Omar himself was caught with a cell phone in his cell.  The jury also heard testimony that the general public is probably unaware of inmates' ability to access cell phones in prison.  And the prosecutor's argument to the jury—that they could find Mr. Sifuentes' testimony to be corroborated by the correctional officer's testimony about contraband cell phones in Omar's prison—was based on a permissible inference from the trial evidence.  In this context, the prosecutor's passing reference to her own prior assumptions about cell phones in prison did not clearly or obviously express either a personal belief in Mr. Sifuentes' testimony or a suggestion that his testimony was supported by unknown evidence that had not been presented at trial, and Defendant thus has not shown improper bolstering under the plain error standard.

We likewise see no clear or obvious error in the prosecution's references in opening and closing arguments to the 404(b) evidence about the earlier conspiracy.

Defendant does not dispute that the prosecution's summation of the evidence was consistent with Mr. Sifuentes' testimony; rather, he argues that it was improper for the prosecutor to refer to this evidence without expressly explaining to the jury that this evidence was introduced only to show Defendant's knowledge, intent, and motive. Defendant does not cite to any cases which require prosecutors to include such explanations in their summation of 404(b) evidence, and he has therefore failed to carry his burden of persuading us that the prosecutor committed a clear or obvious error under current law. Moreover, we note the jury was properly instructed both that the attorneys' arguments were not evidence and that the evidence of the earlier conspiracy was admitted only for the limited purpose of proving knowledge, intent, and motive, and these instructions significantly weigh against a finding of plain error in such circumstances. *See, e.g.*, *United States v. Espinosa*, 771 F.2d 1382, 1401 (10th Cir. 1985); *United States v. Guerrero*, 517 F.2d 528, 531 (10th Cir. 1975).

Finally, we see no clear or obvious error in the prosecution's introduction during redirect examination of photographs of the hotel and nearby FedEx in Chino where Mr. Sifuentes testified he and Defendant packaged and then shipped the drugs on their first two trips to California. During the earlier cross-examination, defense counsel had asked Mr. Sifuentes several questions about whether the police had done anything to verify his story, asking twice whether he had ever been asked to access Google Maps and "pinpoint this hotel with the FedEx across the street." (Appellant's App. Vol. I. at 1257–58.) When Mr. Sifuentes testified that he did not remember ever doing so, defense counsel

said, "So basically based on that, we just have to take your word for it." (*Id.* at 1258.) During a sidebar discussion, the government explained to the court that there had been an investigation to verify Mr. Sifuentes' statements about the hotel and nearby FedEx, but Mr. Sifuentes had been instructed not to say anything regarding the investigation in order to comply with the court's *in limine* evidentiary ruling on what evidence the government could introduce under Rule 404(b). Without introducing evidence of this investigation, the government then attempted to rehabilitate Mr. Sifuentes' testimony by introducing—without objection—photographs that corroborated his story about the location of the hotel and FedEx. To the extent this may have been an error, we are not persuaded it was a clear or obvious one.

As for all of Defendant's remaining claims of prosecutorial misconduct, even assuming without deciding that these claims showed a sufficiently obvious error to satisfy the second prong of plain error review, they all fail on the third prong. "Satisfying the third prong of plain-error review—that the error affects substantial rights—usually means that the error must have affected the outcome of the district court proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (internal quotation marks omitted). "The appellant bears the burden to make this showing." *Id.* at 733. In other words, in order to satisfy this prong of review, Defendant must show "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 81–82 (2004) (internal quotation marks and brackets omitted).

None of Defendant's claims satisfy this standard. For instance, Defendant argues it was prosecutorial misconduct for the prosecutor to respond to Defendant's arguments about the government's investigation into Mr. Sifuentes' friend Chabacano by asking, "Do you think Chabacano is out there living free?" and then saying, "His trial will be another day with another jury." (Appellant's App. Vol. I at 1410.) While it may have been plainly improper for the prosecutor to make this argument to the jury, unsupported as it was by any trial evidence and suggestive as it may have been, we are simply not persuaded that, were it not for this statement about Chabacano, the jury would likely have found Defendant not guilty of the charges against him. We likewise conclude that Defendant has not shown a reasonable probability that the jury would likely have found him not guilty if the prosecutor had not (1) said that Defendant and Mr. Sifuentes went "right back . . . to business" after almost being caught on their last trip to California (*id.* at 1406); (2) said that the amount of money Defendant was making in this conspiracy was a lot of money for "a defendant who makes $12 an hour before taxes" (*id.* at 1398); (3) told the jury that Defendant needed "to be held responsible for what he has done" (*id.* at 1412–13); and (4) finished her closing argument by saying, "I now ask that you bring justice to us" (*id.* at 1413). *Cf. United States v. Oberle*, 136 F.3d 1414, 1421–22 (10th Cir. 1998) (finding no violation of substantial rights where prosecutor improperly argued that the defendant was a professional bank robber who "had been around the block" and was familiar with the criminal justice system); *United States v. Jones*, 468 F.3d 704, 708–09 (10th Cir. 2006) (finding no plain error in prosecutor's reference to the defendant

as a shark; noting that "[w]e have upheld references to the defendant as "a monster," and other circuits have held it is not plain error when the defendant is referred to as "a lizard," "a nine-headed hydra monster," or "a predator" (citations omitted)); *Spears v. Mullin*, 343 F.3d 1215, 1247 (10th Cir. 2003) (upholding first-degree murder conviction where prosecutor argued that "justice cries out for" a verdict of guilty on the first-degree murder charge and asked jury not to "take an easy way out" by finding them guilty on a lesser charge instead). After reviewing all of Defendant's numerous claims of prosecutorial misconduct in context, we are persuaded that none of them warrant reversal under plain-error review.

We turn then to Defendant's third main argument for reversal: that he should be granted a new trial based on alleged misrepresentations and omissions in Mr. Sifuentes' testimony. The parties dispute the applicable standard of review for this argument. Defendants contends that we review for abuse of discretion, while the government argues that the plain-error standard governs instead. We need not resolve this dispute because Defendant's argument fails under either standard.

"When seeking a mistrial based on the government's alleged use of perjured testimony, the movant must establish that (1) the testimony at issue was false, (2) the testimony was material, and (3) the prosecutor nevertheless knowingly and intentionally relied on the testimony." *United States v. Crockett*, 435 F.3d 1305, 1317 (10th Cir. 2006).

Defendant argues that Mr. Sifuentes intentionally misrepresented the facts in testifying about his third trip to California with Defendant because he did not mention the fact that they stayed at Defendant's cousin's house on this trip, prejudicing Defendant by failing to alert the jury to this legitimate, non-drug-related reason for the trip. Although Mr. Sifuentes testified about their stay with Defendant's cousin on cross-examination, Defendant argues that the cross-examination did not cure the initial omission because defense counsel's inquiry was cut short by the prosecutor's objection, which the court sustained.

The record does not support this argument. The record shows that defense counsel was given ample leeway to ask Mr. Sifuentes about Defendant's stay with his cousin, Defendant's possible non-drug-related reasons for the trip, and the reasons why Mr. Sifuentes did not mention Defendant's cousin during his direct examination. The prosecution only objected to defense counsel's line of questioning after he began inquiring into the details of how law enforcement investigated their stay with Defendant's cousin. Defense counsel asked whether the investigative team inquired further about Defendant's cousin, whether the officers asked about it or whether Mr. Sifuentes initiated the discussion, when they asked these questions, whether the DEA case agent was part of that discussion, and whether any of the other people sitting at the prosecution table had been present. It was at this point the prosecutor requested a side-bar discussion, in which she told the court this line of questioning was going into areas related to the other ongoing criminal case that the government had instructed Mr. Sifuentes not to talk about in order

to comply with the court's *in limine* ruling. After hearing arguments from both sides, the court told defense counsel to stay away from this line of questioning, since it was not fair for defense counsel to suggest that the government had not investigated the stay with Defendant's cousin when the government had conducted an investigation and was only prevented from introducing corroborating evidence obtained in this investigation because of the court's *in limine* ruling.

Nothing about the court's warning prevented defense counsel from eliciting the testimony that Defendant had stayed with his cousin and that he therefore might have had a legitimate, non-drug-related reason for going to California with Mr. Sifuentes. And, indeed, Defendant had already elicited all of this testimony—and attempted to impeach Mr. Sifuentes based on his failure to mention it earlier—before his tangential line of questioning into the government's investigation of Defendant's cousin was cut off. "Where evidence refuting a false statement is revealed in cross-examination, the government cannot be said to have relied on the false direct-examination testimony to obtain a guilty verdict." *Id.* Defendant has shown no error here.

Defendant further argues that Mr. Sifuentes intentionally misrepresented the facts during his direct examination when he testified that he lied "a little" to the police officer who stopped them on their way back from California after this trip, answering "Yes" when the prosecutor asked, "Was the story that you were visiting family in California?" (Appellant's App. Vol. I at 1159.) Defendant argues that this was an intentional misrepresentation because Mr. Sifuentes and Defendant had, in fact, stayed with

Defendant's cousin, so the "story" that he visited family in California was not a lie at all. We are not persuaded that Mr. Sifuentes' testimony constituted an intentional misrepresentation. First, Mr. Sifuentes was always very clear that they stayed with Defendant's cousin, not with any of Mr. Sifuentes' own family members; thus, his testimony that he lied about "visiting family" was arguably not false at all, since Defendant's cousin is not a member of Mr. Sifuentes' family. Morever, Mr. Sifuentes testified that the purpose of their trip was to obtain methamphetamine. Although they stayed with Defendant's cousin overnight, visiting with him was not the purpose of the trip, and we are not persuaded that Mr. Sifuentes perjured himself by testifying that he lied "a little" when he explained his travels to the officers by saying he or they had been visiting family in California. Additionally, we note that this issue was fully developed before the jury, which could decide for itself whether Mr. Sifuentes' testimony about lying to the officer was false. The jury's ability to evaluate Mr. Sifuentes' credibility on this point weighs against a finding of materiality with respect to any falsity in Mr. Sifuentes' testimony. *See United States v. Langston*, 970 F.2d 692, 700–01 (10th Cir. 1992). We accordingly hold that the district court did not abuse its discretion in denying Defendant's motion for a new trial based on Mr. Sifuentes' testimony.

Defendant next argues that the district court erred in the way it handled the jurors' concerns about the Hispanic man in the parking lot. On appeal, Defendant argues that the transcripts of the *in camera* juror interviews show two ways the court mishandled the situation: (1) the court failed to ask all of the jurors whether they were concerned that the

-24-

man in parking lot was somehow related to this case; and (2) the court allowed the trial to continue even though some of the jurors said they were concerned and the male juror who photographed the truck said he was worried about "any type of intimidation or repercussions to members of the jury and/or family or anything like that." (Appellant's App. Vol. II at 177–78.)

The parties dispute the applicable standard of review. We need not resolve this issue, however, because we would affirm even under our usual abuse of discretion standard.

"When juror impartiality is questioned, the trial court has wide discretion in evaluating the competency of a juror to sit, and its decision will not be interfered with except for a clear abuse of discretion." *United States v. Wacker*, 72 F.3d 1453, 1467 (10th Cir. 1995). "[T]he decision whether to excuse a juror rests on whether the juror can remain impartial, a matter of fact uniquely within the observation of the trial court." *United States v. McVeigh*, 153 F.3d 1166, 1185 (10th Cir. 1998). "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling v. United States*, 561 U.S. 358, 386 (2010). It is particularly appropriate "to defer to the trial court's superior ability to evaluate the demeanor and conduct of the juror in gauging impartiality" when a juror's statements are ambiguous on their face. *McVeigh*, 153 F.3d at 1188; *see*

-25-

*also United States v. Harris*, 908 F.2d 728, 734 (11th Cir. 1990) ("Because the trial court is better able to judge the mood at trial and the predilections of the jury, we defer to the district court's conclusion that [an ambiguous] statement did not reflect serious juror contamination.").

Under this deferential standard of review, we affirm. Perhaps it would have been best, as Defendant argues, for the court to expressly ask all of the jurors who were worried about the situation whether their concerns were related to this particular case. However, while the court did not ask this question in the first several interviews, the court asked at least five jurors if anyone had speculated or worried about the parking-lot incident being related to this particular case, and the jurors uniformly reported that they had not heard anyone saying anything like that. Other jurors indicated that their concerns were about parking in a potentially unsafe neighborhood, not about any particular threat posed by the man the female juror had encountered in the lot the previous night. Although this man was apparently Hispanic, the only juror who mentioned his ethnicity was the female juror who saw him, and she only did so in response to the court's request for a description. When the other jurors explained their understanding of why this juror found the man to be suspicious, they only discussed the man's behavior in slowing down and staring at the juror. None of the jurors expressed a belief that the man in the red pickup truck was connected to Defendant somehow. While some of the jurors told the court that they believed it was unwise for jurors to park in a marked parking lot, their statements indicated this incident had simply caused them to think about possible safety

-26-

concerns related to the marked lot that the court might want to address "moving forward." (Appellant's App. Vol. II at 190.) None of the jurors indicated they believed their safety had been compromised by the incident, nor did any of the jurors suggest they felt personally threatened or intimidated with respect to their service in this particular case.

Although the male juror who photographed the truck said he had been concerned about "any type of intimidation or repercussions to members of the jury an(d)/or (sic) family or anything like that" (Appellant's App. Vol. 2 at 178), he did not express this concern to the other jurors, and he told the court that he was "[n]ot particularly" concerned because he was "not an alarmist" (*id.* at 181). We acknowledge that his statements to the district court about his concerns are not entirely consistent or unambiguous. However, "the very ambiguity of [his] remark[s] is a reason to defer to the trial court's superior ability to evaluate the demeanor and conduct of the juror in gauging impartiality." *McVeigh*, 153 F.3d at 1188; *see also Patton v. Yount*, 467 U.S. 1025, 1040 (1984) ("[W]hile the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty.").

Deferring to the district court's personal observations of the jurors and the concerns they expressed, we hold that the district court did not abuse its wide discretion in questioning the jurors, evaluating their responses and demeanor, and concluding that each juror could continue to be fair and impartial in deciding the case. We therefore reject Defendant's argument that he is entitled to a new trial based on the way the district court handled this situation.

Finally, Defendant argues that the cumulative effect of all of the errors in his case was prejudicial, even if the errors on their own might have been harmless.  Because we find no error, there is no cause for a cumulative harmless-error analysis.  *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990).

We accordingly **AFFIRM**.