FILED
**United States Court of Appeals
Tenth Circuit**

**March 18, 2025**

**Christopher M. Wolpert
Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

MARTIN LOPEZ,

     Defendant - Appellant.

No. 23-2121

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:21-CR-00284-DHU-1)**
_____

Amy W. Senia, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), of the Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Tiffany L. Walters, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, with her on the briefs), of the Office of the United States Attorney, District of New Mexico, Albuquerque, New Mexico, for Plaintiff-Appellee.
_____

Before **MATHESON**, **BACHARACH**, and **CARSON**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

Mr. Martin Lopez was convicted of carjacking and brandishing a firearm in furtherance of a crime of violence. The convictions stemmed from a clash involving Mr. Lopez, his girlfriend, and a friend of the girlfriend. The government attributed the clash to Mr. Lopez's effort to take his girlfriend's car against her will.

Mr. Lopez presents two main issues: (1) introduction of testimonial hearsay in violation of the evidentiary rules and the Confrontation Clause and (2) improper closing argument.

The first issue grew out of testimony by investigating officers that they had questioned Mr. Lopez's girlfriend. The officers didn't directly testify about what the girlfriend had said. But Mr. Lopez argues that the testimony obviously implied that the girlfriend had corroborated the government's account.

We disagree, concluding that any such implication wouldn't have been obvious. We've said that the hearsay rules require an identifiable statement, and it's not clear from the officers' testimony what the girlfriend had said. So any possible hearsay or violation of the Confrontation Clause wouldn't have been obvious.

The second issue involved the government's closing argument. The government referred to threats against witnesses and their fears. For this issue, we consider whether any improprieties would have been *plain*. In our view, they wouldn't have been. Granted, a juror might have interpreted

2

some of the references as stretches from the evidence. For example, Mr. Lopez conveyed threats to some of the witnesses, but not all of them. And it's not clear what the government meant when referring to the victims' reports as truthful. But at most, the closing argument contained ambiguities, which wouldn't render any improprieties *plain*.

## Background

### I.    The incident and the investigation

The case arose when Mr. Lopez's girlfriend, Ms. Cristina Molina, was driving her friend (Ms. Catalina Rios). When the two women stopped, Mr. Lopez entered the car, began fighting with Ms. Molina, and drove away. As he did so, Ms. Rios secretly called 911 and recorded the events as they unfolded.

After a few minutes, Ms. Rios spoke to the 911 operator, reporting that she had just been kicked out of the car. She identified the culprit as Martin Lopez and said that he was driving and holding Ms. Molina at gunpoint.

A companion of Ms. Molina, Mr. Dominic Padilla, had also been in the car before the incident. Afterward, he called 911 twice to give a report. In these calls, Mr. Padilla seemed to parrot Ms. Rios's account.

Soon afterward, Ms. Molina called 911, saying that

- she and her boyfriend had been in a fight,
- she was "okay," and

3

- she had not been kidnapped.

Supp. R. vol. 3, Ex. 11. The 911 dispatcher told Ms. Molina to make in-person contact with law enforcement. Ms. Molina agreed to come to the police office, but she didn't show up.

Within a few hours, officers found Ms. Molina in a car matching the description from the 911 calls. Mr. Lopez was standing by the side of the car. As an officer approached, Mr. Lopez fled. Ms. Molina remained in the car, but didn't have a key. Inside the car were Mr. Lopez's cellphone and an unfired 9-millimeter bullet.

The officers brought Ms. Molina to the police office, but she appeared reluctant to cooperate. As the investigation continued, officers repeatedly tried to locate Ms. Molina to speak with her about the incident. Officers were eventually able to interview Ms. Molina a second time. But she disobeyed a grand jury subpoena and didn't testify at the trial despite extensive efforts by the government to secure her testimony.

## II.   The trial

Mr. Lopez was charged with

- carjacking and

- brandishing and discharging a firearm in furtherance of a crime of violence.

At trial, the government presented

- recordings and transcripts of the 911 calls,

4

- photos of a bullet in the car, and

- a photo of a bruise on Ms. Rios's face.

The government also called lay witnesses and law enforcement officers to testify.

### A.    Catalina Rios, Dominic Padilla, and Joshua Rios testified about the events.

The lay witnesses included Ms. Rios, who testified that

- Mr. Lopez had been mad when he arrived,

- he had fought with Ms. Molina over the car keys,

- Mr. Lopez had drawn his gun and pointed it at Ms. Molina,

- Ms. Rios had called 911 and hidden her phone as Mr. Lopez and Ms. Molina fought,

- Mr. Lopez had cocked the gun and a bullet flew out,

- Mr. Lopez had hit Ms. Rios in the face with the gun,

- Mr. Lopez had raised the gun and threatened to hurt Ms. Rios if she called the police,

- Mr. Lopez had forced Ms. Rios out of the car while it was still moving and then fired shots out the window,

- Mr. Lopez had used a 9-millimeter pistol during the carjacking, and

- Mr. Lopez had threatened to kill Ms. Rios if she reported the incident to law enforcement.

The government also called Ms. Rios's cousin, Mr. Rios, who testified that

5

- he had been working at a nearby store when the incident occurred,

- Ms. Rios had called two days after the incident and said that Mr. Lopez had hit her with a gun, and

- Mr. Lopez had said that Mr. Rios "better have [Ms. Rios] not say a damn thing or he knows some people." R. vol. 3, at 279.

**B.    Sergeant Whittaker and Agent Romero testified about their interviews of Ms. Molina.**

The government also presented testimony by two law enforcement officers: Sergeant Jesse Whittaker of the state police and Special Agent Russell Romero of the FBI.

Sergeant Whittaker testified about his role in the ensuing investigation:

Q:    Okay. As [sic] your role as basically a case agent with State Police, I know that you stated that that night, after you found [Ms. Molina], that you had spoken with her to some extent, and that she indicated that she didn't want to go forward with any type of investigation or prosecution?

A:    That is correct.

Q:    Okay. Have you made efforts since then to speak with her?

A:    Yes, I have.

Q:    Has she ever spoken with law enforcement and gave [sic] a statement about what happened?

A:    She did at the initial day with me, although it was not a full statement, and then I did go with FBI on another occasion and speak with her again, and we were able to procure more details of the incident that day.

Q:    And based on those details, did the investigation proceed?

A:    Yes, it did.

*Id.* at 554–55.

Agent Romero also testified about his questioning of Ms. Molina:

Q:    I do not want to ask you about anything specific that she said, and so none of my questions are trying to elicit a specific statement, okay?

A:    Okay.

Q:    But I want to cover some topics that you spoke about with her, okay? Did you ask her about the vehicle?

A:    Yes, I did.

Q:    And is that the same vehicle that we have been talking about in the courtroom this week?

A:    Yes, it is.

Q:    Is that the same vehicle that is alleged in the Indictment?

A:    Yes, it is.

Q:    Did you ask her about whether or not there was ever a firearm?

A:    Yes, I did.

Q:    Did you ask her about whether or not the defendant threatened her with a firearm at O'Reilly's?

A:    Yes, I did.

Q:    Did you ask her whether or not she willingly gave the defendant her vehicle on October the 31st?

*Id.* at 626–27.

7

At that point, Mr. Lopez's attorney objected based on hearsay.[1] The district court overruled the objection, and the government resumed its questioning:

Q:   Did you ask Ms. Molina whether or not she willingly gave her vehicle to the defendant on October the 31st?

A:   Yes.

Q:   And after your two interviews with Ms. Molina, did you decide to pursue the charges that the jury will then decide at the end of the week?

A:   Yes, I did, and, actually, that was—after the first interview, we decided to pursue the charges.

*Id.* at 627.

**C.    The government's closing argument referred to threats and clarified the evidence about Ms. Molina.**

During closing argument, the government remarked about Mr. Lopez's efforts to frighten witnesses, stating that he

- had been "counting on his threats to scare away the witnesses," *id.* at 24,

- had scared Ms. Molina away from the trial,

- had threatened to kill Ms. Rios if she testified, and

- would "threaten to kill everyone . . . who tries to stop him." *Id.* at 34.

---

[1]    The attorney also objected based on relevance, but Mr. Lopez does not assert relevance as a basis for reversal.

The government also said that Ms. Rios and Ms. Molina didn't "deserve to live in fear for reporting the truth." *Id.*

Mr. Lopez's counsel then gave his closing argument, which noted Ms. Molina's absence from the trial. On rebuttal, the government clarified what the evidence showed and didn't show, explaining that the jury hadn't "heard that she didn't tell her version of the story to the police and to the FBI when they interviewed her." *Id.* at 62.

**Discussion**

I.     **The district court did not commit reversible error by allowing the officers to testify about their questioning of Ms. Molina.**

Mr. Lopez complains about the testimony by Sergeant Whittaker and Agent Romero. The two officers had interviewed Ms. Molina before and after the government decided to charge Mr. Lopez.

At trial, Mr. Lopez objected to only a small part of what he challenges here. So we address the bulk of Mr. Lopez's challenge under the plain-error standard.

A.     **The district court did not abuse its discretion by overruling Mr. Lopez's objection to a question posed to Agent Romero.**

This issue includes the admissibility of this question posed to Agent Romero: "Did you ask [Ms. Molina] whether or not she willingly gave the defendant her vehicle on October the 31st?" *Id.* at 627. For this question, Mr. Lopez objected based on hearsay; and the district court overruled the

9

objection. We review this ruling for abuse of discretion. *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir. 2002).

A district court abuses its discretion by admitting or excluding evidence based on a legal error, a clearly erroneous factual finding, or a manifest error in judgment. *United States v. Harper*, 118 F.4th 1288, 1296 (10th Cir. 2024). Because hearsay determinations are highly fact-dependent, they trigger heightened deference to the district court's ruling. *Id.* at 1295–96.

*Hearsay* is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). A question calls for hearsay when inviting an answer that introduces an out-of-court statement. *See, e.g., Marks v. United States*, 260 F.2d 377, 383 (10th Cir. 1958) (stating that the question did not call for hearsay because the witness had not been asked to recount an out-of-court conversation).

We apply this definition to the question asked of Agent Romero. That question addressed only what Agent Romero had asked—not what Ms. Molina had said. In response to the objection, the government clarified that it was "not asking for any statements." R. vol. 3, at 627. With this clarification, the court could reasonably treat the question as addressing only what Agent Romero had asked—not how Ms. Molina had responded.

And it's not clear whether Agent Romero asked Ms. Molina about the possible carjacking during the first interview, the second, or both. Agent

Romero did explain later that the government had decided to pursue charges after the first interview. But that explanation didn't say what Ms. Molina might have disclosed. And in any case, the court didn't have the benefit of that explanation when ruling on Mr. Lopez's objection. *See United States v. Herrera*, 51 F.4th 1226, 1277 (10th Cir. 2022) (stating that "we evaluate the district court's exercise of discretion based on the information presented at the time of the ruling"); *see also United States v. Hernandez*, 104 F.4th 755, 762 (10th Cir. 2024) (rejecting a defendant's challenge to an evidentiary ruling because "the district court had to exercise its discretion based on the contentions and information presented").

Based on the information known when Mr. Lopez objected, the district court didn't abuse its discretion by rejecting the characterization as hearsay.

## B.     The district court didn't plainly err by allowing the rest of the officers' testimony.

On appeal, Mr. Lopez extends his hearsay objection to the rest of the testimony about the interviews with Ms. Molina and adds arguments involving the Confrontation Clause and Federal Rule of Evidence 403. The plain-error standard governs our review of these arguments because they're unpreserved. *See United States v. Pablo*, 696 F.3d 1280, 1287 (10th Cir.

2012) (Confrontation Clause); *United States v. Rackstraw*, 7 F.3d 1476,

1482 (10th Cir. 1993) (Rule 403).

To establish plain error, Mr. Lopez must show that

- an error occurred,

- the error is plain or obvious,

- the error affected his substantial rights, and

- the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Pablo*, 696 F.3d at 1287.

### 1. Introduction of the officers' testimony was not a clear or obvious error.

An error is *plain* if it is "so clear or obvious that it could not be

subject to any reasonable dispute." *United States v. Courtney*, 816 F.3d

681, 684 (10th Cir. 2016). We conclude that neither officer's testimony

clearly or obviously violated the hearsay rule, the Confrontation Clause, or

Federal Rule of Evidence 403.

### a. Introduction of the officers' testimony didn't clearly or obviously violate the hearsay rule or the Confrontation Clause.

Mr. Lopez acknowledges that neither officer directly testified about

what Ms. Molina had said. But Mr. Lopez argues that the questions

obviously implied that Ms. Molina had confirmed the government's

suspicion.

12

We've often addressed the applicability of the hearsay rule and the Confrontation Clause when someone testifies explicitly about what another individual told the police during an investigation. But here we aren't addressing explicit testimony about what an individual had said. Instead, we're addressing inferences based on the questions themselves and what the officers did afterward. (The parties refer to this kind of testimony as an *implied statement*.)

Though we haven't addressed the relationship between the Confrontation Clause and implied statements, other circuits have done so and have uniformly held that implied statements can constitute inadmissible hearsay and violate the Confrontation Clause: *United States v. Meises*, 645 F.3d 5, 21 (1st Cir. 2011); *Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir. 2002); *United States v. Reynolds*, 715 F.2d 99, 103 (3d Cir. 1983); *Favre v. Henderson*, 464 F.2d 359, 364 (5th Cir. 1972); *Ocampo v. Vail*, 649 F.3d 1098, 1111 (9th Cir. 2011); *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983). That case law creates a consensus, and an obvious violation could constitute *plain* error. *United States v. Egli*, 13 F.4th 1139, 1146 (10th Cir. 2021). But here the existence of an implied statement wasn't clear or obvious.

### i.    Implied statements can violate the hearsay rule and the Confrontation Clause.

The hearsay rule and the Confrontation Clause "are generally designed to protect similar values." *California v. Green*, 399 U.S. 149, 155 (1970). Given the similarity in purpose, testimonial hearsay can violate the Confrontation Clause when the declarant is unavailable for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). But in the absence of inadmissible hearsay, the Confrontation Clause is generally not implicated. *See United States v. Ibarra-Diaz*, 805 F.3d 908, 919–20 (10th Cir. 2015) (stating that in the absence of hearsay, testimony "is generally of no concern to the Confrontation Clause").

Six circuits have recognized that an implied statement can constitute *hearsay* and a violation of the Confrontation Clause:

- First Circuit: The confrontation right is "no less vital" when testimonial hearsay is introduced "indirectly, but still unmistakably." *United States v. Meises*, 645 F.3d 5, 21 (1st Cir. 2011). So the Confrontation Clause is triggered "if what the jury hears is, in substance, an untested, out-of-court accusation against the defendant, particularly if the inculpatory statement is made to law enforcement authorities." *Id.*[2]

---

[2]    We said in *United States v. Duran* that we "have declined to follow *Meises*." 941 F.3d 435, 447 n.7 (10th Cir. 2019). We made that statement in a footnote that cited two cases. The first was an unpublished opinion that rejected *Meises*'s position on testimony about an overview of an alleged conspiracy. *United States v. Fletcher*, 497 F. App'x 795, 804–05 (10th Cir. 2012) (unpublished). The second was a published opinion stating that

- Second Circuit: "[T]estimony that indirectly includes an accusation against the defendant may violate the Confrontation Clause even if the testimony is not a direct reiteration of the accusatory assertion." *Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir. 2002).

- Third Circuit: "[S]tatements containing express assertions may also contain implied assertions qualifying as hearsay" and trigger the Confrontation Clause. *United States v. Reynolds*, 715 F.2d 99, 103 (3d Cir. 1983).

- Fifth Circuit: Testimony "need not repeat the absent witness's exact statement to implicate the Confrontation Clause." *United States v. Jones*, 930 F.3d 366, 376 (5th Cir. 2019). Instead, the Confrontation Clause is triggered when testimony leads to a "clear and logical inference that out-of-court declarants believed and said" that the defendant had been "guilty of the crime charged." *Favre v. Henderson*, 464 F.2d 359, 364 (5th Cir. 1972).

- Ninth Circuit: The Confrontation Clause applies "if the substance of an out-of-court testimonial statement is likely to be inferred by the jury." *Ocampo v. Vail*, 649 F.3d 1098, 1111 (9th Cir. 2011).

- Eleventh Circuit: The Confrontation Clause may be triggered when a statement's "nature and substance" can be "readily inferred." *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983).

Those cases reflect a pragmatic approach to the hearsay rule and the

Confrontation Clause, recognizing their roles in ensuring procedural

---

*Meises* and two other First Circuit cases had not established well-settled law in our circuit. *United States v. Marquez*, 898 F.3d 1036, 1051–52 (10th Cir. 2018). So our previous refusals to follow *Meises* didn't address whether implied statements could violate the hearsay rule or the Confrontation Clause.

15

fairness and reliable factfinding. *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

But our case law doesn't necessarily treat implied and express statements as interchangeable. For example, we've explained that the Confrontation Clause is violated only when the testimony involves an "identifiable" out-of-court statement. *United States v. Ibarra-Diaz*, 805 F.3d 908, 919–20 (10th Cir. 2015). A statement is *identifiable* when it's "able to be recognized." *Identifiable*, *New Oxford American Dictionary* (3d ed. 2010). A statement is obviously recognizable when it's quoted verbatim. Likewise, an implied statement may be recognizable depending on the strength of the implication.

Suppose an officer testifies about an out-of-court interview with a victim of an alleged assault and implies that the victim identified someone as the assailant. The testimony might introduce an identifiable statement if the content of the victim's account is readily apparent. *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983).

We thus consider the likelihood that the jury could have inferred what the victim had said out of court.[3] To evaluate that likelihood here, we must consider

- what the officers said that they had asked Ms. Molina,

- what the officers said that they had done after the interviews, and

- what the jury knew about other information available to the officers.

Together, these considerations don't create a clear or obvious inference about what Ms. Molina had told the officers.

### ii. The officers didn't clearly or obviously testify about what Ms. Molina had said.

### (a) Sergeant Whittaker

Sergeant Whittaker's testimony revealed three facts:

1. He had spoken twice with Ms. Molina.

2. During the second conversation, Ms. Molina had given "more details of the incident."

---

[3] Courts have differed in their language describing the likelihood of that inference. For example, the Eleventh Circuit has said that the Confrontation Clause may be violated when the content of an out-of-court statement can be "readily inferred." *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983). On the other hand, the Second Circuit has focused on whether the testimony "clearly conveyed" what someone had said. *United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994). But we don't need to choose the standard to apply in future cases involving implied statements. Here we're addressing the issue under the limited lens of plain-error review, addressing only whether the substance of what Ms. Molina had said would have been clear or obvious when the officers testified. *See* p. 12, above.

3.      Based on those details, the investigation continued. R. vol. 3, at 555. But Sergeant Whittaker did not say what "details" Ms. Molina had divulged. Without that information, Ms. Molina's statements were not clearly or obviously identifiable.

A similar situation existed in *United States v. Ibarra-Diaz*, 805 F.3d 908, 919–20 (10th Cir. 2015). There a detective testified that a conversation with an informant had led law enforcement to investigate the defendant. *Id.* at 919. Our question was whether this testimony had entailed hearsay. *Id.* We answered *no*, reasoning that the detective hadn't conveyed an identifiable statement from the informant. *Id.* at 919–20. Instead, the jury simply knew that the detective's conversation with the informant had prompted the investigation. *Id.* at 919.

The same is true here. As in *Ibarra-Diaz*, the testimony revealed that information learned in an out-of-court conversation had led law enforcement officers to investigate the defendant. And here, as in *Ibarra-Diaz*, the testimony didn't reveal anything else about the out-of-court conversation. So Ms. Molina's statements to Sergeant Whittaker weren't clearly or obviously identifiable.

**(b)    Agent Romero**

Unlike Sergeant Whittaker, Agent Romero

- testified about what he had asked Ms. Molina during the two interviews and

18

- noted that he had decided to pursue charges after the first interview.

But Agent Romero didn't testify

- which questions Ms. Molina had answered or what she had said or

- which questions, if any, had preceded the decision to pursue charges.

The government asked Agent Romero whether he had asked Ms. Molina about various subjects corresponding to elements of the charges. So the jury might have inferred Ms. Molina's corroboration of Ms. Rios's account. But not necessarily. For example, Ms. Molina might have

- denied getting carjacked or

- declined to answer some of Agent Romero's questions.[4]

After all, the government questioned Agent Romero about what he had asked—not whether Ms. Molina had answered.

---

[4]    The government concedes that Agent Romero's testimony suggests that Ms. Molina "said *something* incriminating" against Mr. Lopez. Appellee's Resp. Br. at 29 (emphasis in original). But even if the government is right, what she said is not clear or obvious. For example, she might have

- confirmed the carjacking but refused to say whether Mr. Lopez had used a gun or

- confirmed that Mr. Lopez had a gun but denied that he had made any threats.

Agent Romero's testimony was also ambiguous about the timing of his questions in relation to his decision to pursue charges against Mr. Lopez. The government questioned Agent Romero about what he had asked Ms. Molina. Agent Romero then testified that he had decided to pursue charges after the *first* interview. But Agent Romero never said which questions he had asked in the first interview. So the jury had no way to ascertain which questions had preceded Agent Romero's decision to pursue charges.

Regardless of the ambiguity, Mr. Lopez's argument assumes that the government wouldn't have brought the charges without Ms. Molina's confirmation of the carjacking. This assumption is at least debatable. No one testified that Ms. Molina's confirmation would have influenced officers' charging decision. To the contrary, Sergeant Whittaker testified that the state "will always press the charges regardless if the individual that was identified as a victim, whether they want to proceed or not." R. vol. 3, at 533.

Coupled with Sergeant Whittaker's testimony, the ambiguities in Agent Romero's testimony weigh against the existence of a clear or obvious implied statement.

### iii. The officers didn't causally connect Ms. Molina's interviews and the decision to charge Mr. Lopez.

Beyond the ambiguities of the testimony itself, Agent Romero never said why he had decided to pursue charges against Mr. Lopez. Instead, Agent Romero testified only about the timing of the charging decision, explaining that he had decided to pursue charges after his first interview of Ms. Molina.

Many of the out-of-circuit cases involved questions about causation rather than timing. For example, in *Ryan v. Miller*, the government repeatedly asked whether officers had taken certain actions, including advising defendants of their rights, "as a result of" conversations with other officers. 303 F.3d 231, 241–43 (2d Cir. 2002). The officers testified that they had taken action, implying that the other officers had given the testifying officers reason to believe that the defendants had committed a crime. *Id.* The Second Circuit held that the testimony violated the Confrontation Clause. *Id.* at 250–51.

Similarly, in *United States v. Jones*, the government asked an officer whether he had stopped the defendant's vehicle "based on" a confidential source's report that the defendant had just completed a drug deal. 930 F.3d 366, 376 (5th Cir. 2019). The officer testified that he had based the stop on the source's report of a drug deal, and the Fifth Circuit held that this testimony had violated the Confrontation Clause. *Id.* at 376–78.

21

The Fifth Circuit reached the same conclusion in *United States v. Kizzee*, 877 F.3d 650, 656–59 (5th Cir. 2017). That case involved an officer's testimony that he had been able to obtain a search warrant "based [in part] on" information learned from an out-of-court conversation with an informant. *Id.* at 655.

Granted, a causal phrase may not always be necessary to create implied hearsay. *See United States v. Meises*, 645 F.3d 5, 19, 21–22 (1st Cir. 2011) (treating testimony as an implied statement when the question involved whether the targets had changed after the interview). But a causal phrase can sometimes make an implied statement clear and obvious. And the absence of such a phrase here rendered the implication even less clear or obvious than it would otherwise have been.

### iv.    The existence of other incriminating evidence created uncertainty about what Ms. Molina had said.

The implication might also be clear or obvious when a declarant's statement outside of court would create the only meaningful evidence against the defendant. For example, in a case where the victim's account would supply the only realistic evidence of guilt, officers might clearly convey corroboration when testifying that they decided to pursue charges after interviewing the victim.

But the inference of corroboration is less clear or obvious when the officers already had other evidence of guilt. Here, for example, the officers

22

questioned Ms. Molina only after they had already obtained four other

pieces of evidence supporting the charges:

1.     Ms. Rios had recorded the events by secretly calling 911 while Mr. Lopez battled Ms. Molina,

2.     Ms. Rios had identified Mr. Lopez as the perpetrator,

3.     Ms. Rios had sustained a noticeable bruise on her face, and

4.     officers had found Ms. Molina in her car without her car key (after Mr. Lopez had fled the scene).

Given these four pieces of evidence, it's not clear or obvious that the

officers would have needed Ms. Molina's corroboration in order to charge

Mr. Lopez.

Granted, an out-of-court statement may be sufficiently identifiable

even when the government has other evidence of guilt. *See Ryan v. Miller*,

303 F.3d 231, 251 (2d Cir. 2002) ("[T]he Confrontation Clause does not

contain an exception allowing hearsay accusations as long as the police

could have suspected the defendant without the accusations."). But only a

clear or obvious violation will render an error *plain*. *United States v.*

*Pablo*, 696 F.3d 1280, 1290 (10th Cir. 2012); *see* p. 12, above. And here,

the existence of an identifiable statement is clouded by the presence of

other evidence supporting the charges.

* * *

In sum, the officers' testimony didn't clearly or obviously refer to an

identifiable statement from Ms. Molina. Without a statement that was

clearly or obviously identifiable, a possible violation of the hearsay rule or the Confrontation Clause wouldn't be considered *plain*.[5]

### b. Neither officer's testimony plainly violated Federal Rule of Evidence 403.

Mr. Lopez argues in the alternative that the district court should have excluded the officers' testimony as unfairly prejudicial under Federal Rule of Evidence 403. But Mr. Lopez admittedly failed to preserve this argument and acknowledges that it's reviewable only under the plain-error standard. *See* p. 12, above.

Under this standard, Mr. Lopez must show that the district court clearly or obviously misapplied Rule 403 by allowing the officers to testify. *See* p. 12, above. In assessing the strength of that showing, we give the officers' testimony its "maximum reasonable degree of relevance and its minimum reasonable danger of unfair prejudice." *United States v. Tee*, 881 F.3d 1258, 1273 (10th Cir. 2018). With this view of the relevance and risk of unfair prejudice, the district court didn't clearly or obviously err in declining to exclude the evidence under Rule 403.

The district court could reasonably see at least some relevance in the officers' testimony, as it provided background information about the scope

---

[5]    The government also argues that Mr. Lopez opened the door to the disputed testimony. We need not consider this argument: Even if Mr. Lopez hadn't opened the door to the officers' testimony, it wouldn't have been clearly or obviously inadmissible.

of the investigation. *See, e.g.*, *United States v. Freeman*, 816 F.2d 558, 563–64 (10th Cir. 1987) (concluding that a confidential informant's statement to law enforcement was relevant to show why officers had been watching the defendant). The officers' testimony arguably provided that background by informing the jury that the officers hadn't neglected to interview one of the alleged victims (Ms. Molina). For example, Sergeant Whittaker noted that the police had obtained some of the details from Ms. Molina. And Agent Romero identified some of the questions he had asked. Their testimony could thus counter skepticism about the thoroughness of the investigation.

Granted, the jury could have inferred the subject-matter of the interviews without help from Agent Romero. And the government arguably could have provided the same background with a more general description of the interviews. *See* Fed. R. Evid. 403 adv. comm. note (stating that "availability of other means of proof may also be an appropriate factor" in Rule 403 balancing). But the jury had already learned about Ms. Molina's unwillingness to cooperate. So the district court could reasonably regard the testimony as relevant by providing a broader picture of Ms. Molina's participation in the investigation.

The district court could also have reasonably discounted the risk of unfair prejudice from the officers' testimony. Neither officer testified whether Ms. Molina had said anything incriminating. Sergeant Whittaker

25

testified only that Ms. Molina had provided additional details. Agent Romero identified some of the questions, but he didn't say which questions Ms. Molina had answered or what she might have said. Nor did Agent Romero say whether the interviews had helped or hindered the investigation.

Agent Romero did say that the first interview had preceded the decision to pursue charges. But Agent Romero didn't say what he had asked in the first interview. And when Agent Romero began the interviews, the police already had a contemporaneous 911 call from Ms. Rios identifying Mr. Lopez as the perpetrator, had seen Mr. Lopez flee, had seen a bruise on Ms. Rios's face, and had found Ms. Molina in her car without the key. *See* pp. 22–23, above. The jury thus had little reason to know which questions Ms. Molina had answered or what she might have said. Given that uncertainty, the risk of unfair prejudice was neither clear nor obvious.

In sum, the district court didn't clearly or obviously err by declining to exclude the officers' testimony under Rule 403.

### 2.    **Mr. Lopez has not shown an effect on his substantial rights.**

Even if the officers' testimony had been clearly or obviously inadmissible, Mr. Lopez's argument would fail under the plain-error standard because he has not shown an effect on his substantial rights. *See* p. 12, above (identifying the third prong of the plain-error standard as an

effect on the defendant's substantial rights). An error affects a defendant's substantial rights if there is a reasonable probability that the error affected the outcome of the proceeding. *United States v. Jones*, 74 F.4th 1065, 1072 (10th Cir. 2023).

Mr. Lopez focuses on the evidence that he had used a gun during the incident. According to Mr. Lopez, the jury would have needed to infer what Ms. Molina had told the officers. We disagree. The officers said little to suggest that Ms. Molina had said anything about a gun, and the jury had other compelling evidence that Mr. Lopez had used a gun while wresting control of the car from Ms. Molina.

### a.   The officers' testimony provided little reason to infer the presence of a gun.

In assessing prejudice, we start with the potential inferences that the jury could have drawn from the officers' testimony. Neither officer testified that Ms. Molina had said anything about a gun.

In fact, Sergeant Whittaker testified only that he had obtained "details" from Ms. Molina; the jury had no way of knowing whether those details included anything about a gun. R. vol. 3, at 555; *see* pp. 6–7, above.

Nor did Agent Romero testify about anything that Ms. Molina might have said about a gun. Agent Romero did testify that in one of his two interviews, he had asked Ms. Molina whether there was a firearm and

whether Mr. Lopez had threatened her with one. R. vol. 3, at 627; *see* pp. 7–8, above. But Agent Romero didn't testify whether Ms. Molina had answered or, if she had, what she had said.

Given these gaps in the testimony, the jury had little reason to infer the presence of a gun from the officers' questioning of Ms. Molina.

**b.    The other evidence about the gun was overwhelming.**

Though the inference from the officers' testimony was weak, Mr. Lopez argues that Mr. Padilla and Ms. Rios provided implausible testimony at trial. Let's assume for the sake of argument

- that Mr. Lopez is right and

- that the jury didn't believe the trial testimony of Mr. Padilla or Ms. Rios.

Even then, Ms. Rios's 911 call and the physical evidence provided overwhelming evidence that Mr. Lopez had used a gun to take the car from Ms. Molina. *See United States v. Coulter*, 57 F.4th 1168, 1178 (10th Cir. 2023) (concluding that a defendant faced with "overwhelming evidence" of guilt usually cannot establish that an error resulted in prejudice).

**i.    Ms. Rios's 911 call**

Ms. Rios's 911 call supplies powerful evidence that Mr. Lopez had used a gun. Ms. Rios testified that he had used a gun, and Mr. Lopez

questions her credibility. But the government also presented Ms. Rios's secret call to 911 while Mr. Lopez clashed with Ms. Molina.[6]

Courts have "long" recognized the reliability of contemporaneous 911 calls because the callers typically lack an opportunity to misrepresent events. *Navarette v. California*, 572 U.S. 393, 399–400 (2014); Fed. R. Evid. 803 adv. comm. note to ¶¶ 1 & 2. The reliability is enhanced when the caller is experiencing a startling event (like a carjacking). Fed. R. Evid. 803 adv. comm. note to ¶¶ 1 & 2.

Ms. Rios's call to 911 involved not only a contemporaneous report but also a secret recording of the events as they unfolded in the car. In the 911 call, Ms. Rios said that Mr. Lopez had

- "pulled out a gun,"

- threatened to "shoot" Ms. Rios and Ms. Molina,

- pointed the gun at Ms. Molina, and

- hit Ms. Molina multiple times with the gun.

---

[6]    Mr. Lopez points out that

- Ms. Rios testified that Mr. Lopez had fired shots and

- the jury found Mr. Lopez not guilty of discharging the firearm.

Given the jury's finding, Mr. Lopez argues that the jury must have disbelieved at least part of Ms. Rios's trial testimony. For the sake of argument, we assume that Mr. Lopez is right and focus on Ms. Rios's contemporaneous call to 911 rather than her trial testimony.

Supp. R. vol. 2, at 8–11.[7]

Mr. Lopez suggests that Ms. Rios fabricated her account. But it's difficult to imagine how Ms. Rios could have fabricated her account while recording the event as it unfolded in the car. And only seconds after she got out of the car, Ms. Rios said that Mr. Lopez had pulled a gun, threatened to shoot both women, pointed the gun at Ms. Molina, and struck her repeatedly with the gun. If Ms. Rios had concocted this account, she had only seconds to create her story and to make sure that it matched her own recording of the events.

Ms. Rios's contemporaneous 911 call appeared to provide stronger evidence of a gun than any possible inference from the officers' testimony.

### ii.    Physical evidence

Ms. Rios' account in the 911 call was corroborated by the presence of an unfired bullet in the car and a bruise on her face.

### (a)    The bullet provided corroboration.

The police found a single unfired 9-millimeter bullet in Ms. Molina's car. The presence of the bullet corroborates Ms. Rios's 911 call, where she said that a bullet had flown out when Mr. Lopez cocked his gun.

---

[7]    Based on the audio, the government states that Mr. Lopez used the word *shoot*; he says that the word was more likely *through*. The 911 call captures Mr. Lopez's voice. But the audio itself is difficult to follow, and we can't definitively know which word was used.

**(b)    The bruise provided corroboration.**

Ms. Rios also said in the 911 call that Mr. Lopez had hit her "really hard." Supp. R. vol. 2, at 11. The government corroborated the 911 call with a photograph showing a bruise on Ms. Rios's face.



Supp. R. vol. 4, at 14 (redacted).

The jury could reasonably credit Ms. Rios's account in her 911 call based on the photograph. After all, if she hadn't been hit, why would she have a visible bruise on her face right after the confrontation in the car?

Mr. Lopez argues that this bruise is inconsistent with Ms. Rios's "claim that he had repeatedly and violently pistol-whipped her." Appellant's Reply Br. at 23. But Ms. Rios didn't say in her 911 call that she had been hit "repeatedly."[8] And the bruise is consistent with Ms. Rios's report that Mr. Lopez had hit her "really hard." Supp. R. vol. 2, at 11.

---

[8]    Nor did Ms. Rios testify that she had been hit more than once. *See* R. vol. 3, at 329.

Mr. Lopez also argues that the "limited nature" of Ms. Rios's injury is inconsistent with her claim that she had been pushed out of a moving car. Appellant's Reply Br. at 22. But in the 911 call, Ms. Rios didn't say that the car had been moving; she said only that she had been kicked out. The severity of the bruise thus appears consistent with Ms. Rios's account in her 911 call.[9]

* * *

Mr. Lopez argues that the district court should have sua sponte excluded the officers' testimony. But even if the testimony had been clearly or obviously inadmissible, Mr. Lopez hasn't shown an effect on his substantial rights.

The possibility of an unfair inference was slight: Sergeant Whittaker didn't testify about the gun, and Agent Romero said only that he had asked Ms. Molina whether Mr. Lopez had used a gun. No one testified about anything that Ms. Molina had said about the presence of a gun.

---

[9]    Ms. Rios did testify that the car had been moving at "[m]aybe like 25 [miles per hour] or something" when she was pushed out. R. vol. 3, at 328. But we assume for the sake of argument that she

- embellished her account when testifying and

- the jury discounted her trial testimony.

*See* p. 28, above.

But the government presented other compelling evidence that Mr. Lopez had used a gun. This evidence included a contemporaneous recording of the events and Ms. Rios's statements in a 911 call, an unfired bullet in the car, and a photograph showing a bruise on Ms. Rios's face.

Given this combination of evidence, Mr. Lopez hasn't shown an effect on his substantial rights.

## II. The district court did not commit reversible error by allowing the disputed parts of the government's closing argument.

Mr. Lopez contends that the government's closing argument included three kinds of improper statements:

1. assertions about threats against witnesses,

2. vouching for the credibility of witnesses, and

3. violations of the Confrontation Clause.

Mr. Lopez argues that these statements amounted to prosecutorial misconduct. But he didn't preserve these arguments. So we review them under the plain-error standard. *See* p. 12, above. Under this standard, none of the disputed comments are plainly improper.

### A. The plain-error standard applies.

Mr. Lopez didn't object during the government's closing argument. But Mr. Lopez denies a chance to object, pointing out that the district court asked the parties not to interrupt each other's closing arguments.

33

The district court did discourage counsel from interrupting one another's closing arguments, but the court didn't prohibit contemporaneous objections. Let's assume, though, that the court's comments prevented Mr. Lopez from interrupting the government's closing argument. Mr. Lopez still could have preserved an objection by seeking a new trial or curative instruction when the closing arguments ended. *United States v. Taylor*, 514 F.3d 1092, 1096–97 (10th Cir. 2008). But Mr. Lopez didn't say anything even when the government had finished the closing arguments. So we apply the plain-error standard. *Id.* at 1095. Under this standard, Mr. Lopez must show that the government's closing argument was plainly improper. *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011).

**B.    The government's reference to threats wasn't plainly improper.**

Mr. Lopez complains that the government said in closing argument that

- he had threatened the government's lay witnesses[10] and

- his threats had scared Ms. Molina away from the trial.

---

[10]    In one sentence, Mr. Lopez refers to "all witnesses." Appellee's Resp. Br. at 42. But Mr. Lopez's argument addresses only the lay witnesses—not law enforcement officers.

1.     **The government referred to threats against *the witnesses*.**

In closing argument, the government said that Mr. Lopez had threatened the witnesses. This statement was permissible if supported by the evidence or a reasonable inference from the evidence. *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005). But the government couldn't argue that the defendant had threatened witnesses without any evidentiary support. *United States v. Rios*, 611 F.2d 1335, 1342 (10th Cir. 1979).

The government presented testimony by three lay witnesses: Catalina Rios, Dominic Padilla, and Joshua Rios. Ms. Rios testified about threats to herself. And Mr. Rios testified that Mr. Lopez had made clear that Mr. Rios "better have [Ms. Rios] not say a damn thing" or Mr. Lopez "knows some people." R. vol. 3, at 279. Mr. Rios testified that he had interpreted this statement as "kind of a threat on" Ms. Rios (rather than himself). *Id.* at 279.[11] Despite Mr. Rios's interpretation, a jury could regard this statement as a threat against himself.

Even so, there was no evidence that Mr. Lopez had threatened the third lay witness: Dominic Padilla. And Mr. Lopez suggests that the government implied a threat against Mr. Padilla by stating that Mr. Lopez

---

[11]     Mr. Rios also testified that Mr. Lopez could have been trying to express the need for Ms. Rios to tell the truth.

had scared *all* of the witnesses. For this suggestion, Mr. Lopez points to two references.

The first involves a remark in the government's opening statement (rather than closing argument). Here the government said that one of its "main themes" was that "nobody wants to be here because they're so scared about what's going to happen to them." *Id.* at 229. This statement referred to the witnesses' fears rather than a threat from Mr. Lopez.

Was that statement plainly improper? The government did present testimony from Ms. Rios about a threat to her. Mr. Rios later testified that he had received a threat, too, but he interpreted the threat to be against someone else (Ms. Rios). And the government may have expected Ms. Molina to testify about her fear of retribution. Finally, Mr. Padilla testified that he didn't want to testify because he was concerned about being labeled a *rat*. His motivation could suggest a desire not to appear for trial because of fear about what would happen to him.

Mr. Lopez also refers to a statement in closing argument: "[Mr. Lopez] was counting on his threats to scare away the witnesses that you heard from." *Id.* at 809. Mr. Lopez characterizes this statement as an argument that *all* the witnesses had been threatened.

This characterization rests on grammatic parsing of the reference to "the witnesses." The article *the* is *definite*. And when *the* is followed by a plural noun, the combination can suggest either all or some, depending on

36

the context. *See The Chicago Manual of Style* §§ 5.68–69 (16th ed. 2010); *see also Leonor v. Provident Life & Accid. Co.*, 790 F.3d 682, 683 (6th Cir. 2015) ("Whether use of the definite article before a plural noun implies the meaning of 'all' . . . depends on context.").

Perhaps the government used *the* to mean that Mr. Lopez had threatened all the witnesses. If so, the statement would have been inaccurate because there was no evidence of a threat against Mr. Padilla. But this interpretation isn't the only plausible one. The definite article *the* sometimes means some or many rather than all. For example, the Sixth Circuit discussed the term *the items*:

> Of course, in context, the plain meaning of the items may mean "all the items", but in a different context, "the items" may mean "the items as a whole", or may mean "many items" or "most items". The only rule of grammar that we can state confidently in this regard is that context determines whether "the items" means "all the items". Sometimes it does, and sometimes it does not.

*Leonor*, 790 F.3d at 687–88. The court added that based on the context, the term *the important duties* might mean "'the important duties as a whole' or 'most of the important duties.'" *Id.* at 688.

We need not parse the context of the government's reference to *the witnesses*. The jury might have interpreted this term to refer either to some or all of the witnesses. But the government's use of the definite article (*the witnesses*) was ambiguous. Given the ambiguity of the definite article in the context of the government's statement, the reference to *the witnesses*

wasn't plainly improper. *See United States v. Wagner*, 497 F.2d 249, 252 (10th Cir. 1974) (per curiam) (concluding that in combination with other factors, "a faulty grammatical reference made during a summation of the evidence" wasn't improper); *see also United States v. Woods*, 764 F.3d 1242, 1247 (10th Cir. 2014) (concluding that the government's statement in a closing argument didn't constitute *plain error* because the statement was ambiguous); *see also United States v. Christy*, 916 F.3d 814, 825 (10th Cir. 2019) (stating that "courts 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974))).[12]

Given the ambiguity of the statement, the government didn't plainly misstate the testimony.

### 2.   Evidence existed to support the argument about threats against Ms. Molina.

Mr. Lopez also complains that the government said in closing argument that he had kept Ms. Molina away by threatening her. But this statement was supported by reasonable inferences from the evidence. For example, Sergeant Whittaker testified that Ms. Molina had looked scared and that he had been unable to find her on multiple occasions. In addition,

---

[12]   It might be different if Mr. Padilla (the third lay witness) had been a prosecutor or law enforcement officer because that status could have escalated the gravity of the threat. *United States v. Peak*, 498 F.2d 1337, 1339 (6th Cir. 1974). But Mr. Padilla was a layperson rather than a prosecutor or law enforcement officer.

Sergeant Romero testified that Ms. Molina had disobeyed a subpoena to appear before the grand jury; and both Agent Romero and Sergeant Whittaker testified that the government had tried unsuccessfully to serve Ms. Molina with a trial subpoena. In light of this evidence, it wasn't plainly improper for the government to say that Mr. Lopez had used threats to keep Ms. Molina from testifying.[13]

### C.    The government did not plainly vouch for a witness's credibility.

Mr. Lopez also argues that the government vouched for the credibility of Ms. Rios and Ms. Molina. But any possible vouching wouldn't have been *plain*.

Vouching occurs when counsel expresses personal confidence in a witness's credibility. *United States v. Starks*, 34 F.4th 1142, 1173 (10th Cir. 2022). Counsel's expression of confidence can be explicit or involve an implicit indication that the testimony is supported by information withheld from the jury. *Id.*

Mr. Lopez argues that the government

---

[13]    Mr. Lopez argues that if evidence had existed of threats, the government would have offered Ms. Molina's testimony under a hearsay exception for *forfeiture by wrongdoing*. Fed. R. Evid. 804(b)(6). But we have no way to ascertain why the government declined to invoke this exception. Nor does it matter. We consider the challenge to the closing argument based on the evidence presented, not based on speculation about the government's strategic decisions.

- explicitly conveyed personal confidence by characterizing the reports of Ms. Rios and Ms. Molina as "the truth" and

- implicitly endorsed their credibility by highlighting their contacts with law enforcement.

These statements were not plainly improper because

- the case law doesn't clearly prohibit vouching for a non-witness like Ms. Molina,

- the phrase *the truth* didn't explicitly endorse the witnesses' credibility, and

- the government didn't obviously refer to evidence withheld from the jury.

### 1. Vouching rules don't clearly apply to non-witnesses like Ms. Molina.

Mr. Lopez complains of vouching for Ms. Molina, but she didn't testify. And Mr. Lopez doesn't point to case law prohibiting vouching for someone who didn't testify. So any possible vouching for Ms. Molina wouldn't have been *plain*.

### 2. The phrase *the truth* was not plainly an assurance of Ms. Rios's credibility.

Mr. Lopez also points to the government's statement that Ms. Rios doesn't "deserve to live in fear for reporting the truth," R. vol. 3, at 820, arguing that this statement represented to the jury that Ms. Rios's testimony was truthful. As Mr. Lopez argues, the government can't assure the jury that testimony is truthful. *See United States v. Starks*, 34 F.4th

1142, 1173–75 (10th Cir. 2022) (concluding that the government vouched for a witness by saying that the testimony constituted "the absolute truth").

But the government didn't say that Ms. Rios had testified truthfully; the statement instead appeared to focus on Ms. Rios's fears about what might happen if she discussed the incident. The phrase *the truth* could thus reasonably be interpreted as peripheral rather than as vouching for Ms. Rios's credibility. Given the reasonableness of that interpretation, the government's statement in closing did not plainly constitute vouching.

### 3.    The government didn't obviously imply the existence of corroborating evidence withheld from the jury.

Mr. Lopez also argues that the government vouched for Ms. Rios's and Ms. Molina's credibility by referring to corroboration withheld from the jury. *See United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990) (stating that vouching can occur when counsel "implicitly indicat[es] that information not presented to the jury supports the witness' testimony"). But none of the government's comments plainly referred to additional information that corroborated Ms. Rios's testimony.

Mr. Lopez complains that the government said that

- Ms. Molina had given her account of the incident "to the police and to the FBI when they interviewed her" and

- Ms. Rios and Ms. Molina didn't "deserve to live in fear for reporting the truth."

R. vol. 3, at 820, 847. According to Mr. Lopez, these statements

41

- reminded the jury of the pretrial interviews with Ms. Molina and Ms. Rios and

- implied that Ms. Molina and Ms. Rios had shared information corroborating Ms. Rios's testimony and supporting the charges.

Mr. Lopez's interpretation of the statements is debatable.

Sergeant Whittaker, Agent Romero, and Ms. Rios testified that they had participated in these interviews. So the government's comments could simply have reflected the evidence rather than a suggestion that information had been withheld from the jury. *See United States v. Rios-Morales*, 878 F.3d 978, 987 (10th Cir. 2017) (concluding that a reference to evidence introduced at trial was not *vouching*). And the testimony itself didn't plainly imply the existence of unadmitted corroborating evidence. For example, Sergeant Whittaker testified that Ms. Molina had divulged "more details of the incident;" but he didn't identify those details or say whether they were consistent with Ms. Rios's trial testimony. R. vol. 3, at 555.[14] Likewise, Agent Romero testified that he had asked Ms. Molina about various aspects of the incident; but Agent Romero didn't say which questions she had answered or what she had said. And Ms. Rios testified only about her own feelings from her role in the investigation.

---

[14]    For example, the details from Ms. Molina might have related to what happened after Ms. Rios was forced out of the car. That information wouldn't have corroborated any part of Ms. Rios's testimony.

Nor did the government plainly suggest that Ms. Molina had given her account "to the police and the FBI when they interviewed her." *Id.* at 847. This suggestion disregards the context and wording of the government's statement. Before the statement at issue, defense counsel highlighted for the jury that Ms. Molina hadn't appeared at trial to say that she had been carjacked. On rebuttal, the government focused the jury on what it knew and what it didn't: "You never heard —you never heard that she didn't tell her version of the story to the police and to the FBI when they interviewed her. You heard she refused to come into court and tell you her story in here." *Id.*

Framed as a double negative ("you never heard" and "she didn't tell her version"), the statement was inherently ambiguous. Technically, the statement could be interpreted as a truthful account of what the evidence showed and what it didn't: The evidence showed that Ms. Molina didn't testify; but there wasn't any evidence, one way or another, about whether she had given her account to law enforcement.

It's possible, of course, that the jury might have interpreted the government's statement to imply that Ms. Molina had given her account to the police or the FBI. But that implication wasn't the only reasonable one. After all, the jury had evidence of Ms. Molina's refusal to appear before the grand jury, her evasion of a trial subpoena, and her denial of the carjacking when she learned of the 911 calls. So the jury wouldn't

43

necessarily have interpreted the government's statement as a hint that Ms. Molina had corroborated the charges when she talked to law enforcement officers. In these circumstances, the government's statement didn't plainly imply additional evidence of guilt withheld from the jury.

Mr. Lopez asks us to combine this statement with a distinct comment that the government had given in its initial closing argument, stating that Ms. Rios and Ms. Molina didn't "deserve to live in fear for reporting the truth." *Id.* at 820. Here too, the government didn't plainly suggest that it had withheld incriminating information from the jury.

As discussed, the government never said that Ms. Molina had given her version to law enforcement officers. To the contrary, the government emphasized Ms. Molina's reluctance to participate, eliciting evidence that she had defied a subpoena to testify before the grand jury, had avoided a trial subpoena, and had denied the carjacking when she learned of the 911 calls. With this backdrop, the government's statement suggests that Ms. Molina shouldn't have had to experience fear about what would happen if she reported her version of the events.

Nor does the government's statement suggest withholding of information supporting Ms. Rios's credibility. Ms. Rios testified, and the government played her 911 call at trial. So the jury knew what Ms. Rios had told law enforcement, including the threats from Mr. Lopez. The government's statement about Ms. Rios thus reflected the evidence

44

presented. As a result, this statement didn't plainly imply other corroborating information about Ms. Rios's account.

* * *

In sum, the disputed statements did not plainly constitute vouching.

**D.    The government's closing argument did not plainly violate the Confrontation Clause.**

Mr. Lopez also argues that the government violated the Confrontation Clause by implying that Ms. Molina had corroborated the charges. For this argument, Mr. Lopez seems to rely on the same comments that he regards as improper vouching. But as discussed earlier, the government's statements in closing didn't clearly imply that Ms. Molina had given corroborating statements to law enforcement. *See* pp. 41–45, above. And without a clear reference to an identifiable out-of-court statement, the government's closing didn't plainly violate the Confrontation Clause. *See United States v. Ibarra-Diaz*, 805 F.3d 908, 919–20 (10th Cir. 2015); *see also* p. 16, above.

* * *

None of the disputed statements were plainly improper.

**III.    The absence of any qualifying errors prevents cumulative error.**

Mr. Lopez argues that even if none of the alleged errors individually justifies reversal, their cumulative prejudicial effect does. For cumulative error, however, we include only preserved errors and unpreserved errors

that are *plain*. *United States v. Kepler*, 74 F.4th 1292, 1320–321 (10th Cir. 2023). There are no preserved or plain errors, so there can be no cumulative error.

## Disposition

Mr. Lopez has not established any errors that warrant reversal. So we affirm the conviction.

*United States of America v. Martin Lopez*, No. 23-2121
**BACHARACH**, J., concurring.

Mr. Lopez argues that the government violated the Confrontation Clause by implying in closing argument that Ms. Molina had corroborated the charges. The government hasn't questioned the applicability of the Confrontation Clause to statements in closing argument. As a result, the majority has not addressed that issue. *See United States v. Woodard*, 5 F.4th 1148, 1154 (10th Cir. 2021) (stating that "we don't typically craft arguments for affirmance completely *sua sponte* and, more specifically, without the benefit of the parties' adversarial exchange" (cleaned up)). I write separately only to note that this issue remains open in our circuit.

The Supreme Court has sometimes entertained challenges to closing argument as violations of the Confrontation Clause. *See, e.g.*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 n.15 (1974) (entertaining an argument that the prosecutor's remarks prejudiced the right to confrontation, but rejecting the argument because the prosecutor hadn't introduced "statements made by persons unavailable for questioning at trial"). But neither the Supreme Court nor our court has expressly decided the applicability of the Confrontation Clause to statements in closing arguments. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37–38 (1952) (stating that a prior opinion's implicit resolution of an issue

doesn't constitute "binding precedent" when the issue wasn't discussed in the opinion or raised by the parties).

Other circuits are divided over whether the Confrontation Clause applies to statements in closing arguments. For example, the Third Circuit has applied the Confrontation Clause to closing arguments. *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996) ("The Confrontation Clause of the Sixth Amendment is violated when a prosecutor informs the jury that there is a witness who has not testified, but who, if he had testified, would have given inculpatory evidence."). But the Fifth and Sixth Circuits decline to apply the Confrontation Clause to closing arguments because they're not considered *evidence*. *United States v. Solis*, 299 F.3d 420, 442 (5th Cir. 2002) (stating that the Confrontation Clause was not violated "because the closing argument was not evidence"); *United States v. Miller*, 982 F.3d 412, 439 (6th Cir. 2020) ("[T]he Confrontation Clause does not regulate an improper closing argument.");[1] *cf. Luevano v. Holder*,

---

[1] The Eleventh Circuit has recognized a violation of the Confrontation Clause when an inference about an out-of-court statement was "made inevitable—and therefore devastating" by the government's closing argument. *United States v. Schwartz*, 541 F.3d 1331, 1353 (11th Cir. 2008) (cleaned up); *see also Hutchins v. Wainwright*, 715 F.2d 512, 515–16 (11th Cir. 1983) (recognizing a Confrontation Clause violation based in part on a closing argument that explicitly referred to a confidential informant whose existence had been implied in testimony). But the Eleventh Circuit has also concluded that a closing argument didn't violate the Confrontation Clause because the attorney was not a witness and his argument didn't constitute *evidence*. *United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011).

2

660 F.3d 1207, 1213 (10th Cir. 2011) ("Counsel's arguments are not evidence.").

We need not to tackle the issue here given the lack of input from the parties. If we are confronted with the issue, however, we may need to address the applicability of the Confrontation Clause to statements made in closing argument.